**FILED UNDER SEAL**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE JULIA CHILD FOUNDATION FOR GASTRONOMY AND THE CULINARY ARTS, a Massachusetts Charitable Trust, and ALEX PRUD'HOMME,<br><br>          Plaintiffs,<br><br>     -v-<br><br>SONY CORPORATION OF AMERICA, SONY PICTURES ENTERTAINMENT INC., and COLUMBIA PICTURES INDUSTRIES, INC.,<br><br>          Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

Civil Action No. _____

## COMPLAINT

Plaintiffs the Julia Child Foundation for Gastronomy and the Culinary Arts and Alex Prud'homme bring this action for copyright infringement against defendants Sony Corporation of America, Sony Pictures Entertainment Inc., and Columbia Pictures Industries, Inc., pursuant to the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*

## PARTIES

1.     Plaintiff the Julia Child Foundation for Gastronomy and the Culinary Arts (hereinafter, the "Child Foundation") is a charitable trust formed under the laws of the Commonwealth of Massachusetts with its principal office located c/o Ropes & Gray LLP, One International Place, Boston, Massachusetts 02110.  Following the death of Julia Child, pursuant to the provisions of Article First of Julia Child's Last Will and Testament, all rights that Julia

**FILED UNDER SEAL**

Child may have had as an author, editor, contributor, collaborator or performer, together with all other literary or intellectual property that she may have owned, among other things, passed to the Child Foundation, and resides with the Child Foundation to this date.

2.      Plaintiff Alex Prud'homme (hereinafter, "Prud'homme") is the grandnephew of the late Julia Child.  He is a freelance writer whose works have appeared in *The New York Times, The New Yorker*, and other publications.  He is the author of the non-fiction book *The Cell Game* and co-author of the non-fiction book *Forewarned*.

3.      The Child Foundation and Prud'homme collectively are referred to herein as "plaintiffs."

4.      Defendant Sony Corporation of America is a New York corporation that has a principal place of business in New York, New York and is the United States subsidiary of Sony Corporation, which is headquartered in Tokyo, Japan.  It is engaged in the business of designing, manufacturing, marketing, and selling various audio, video, communications, and information technology products, which include motion pictures, music, television, computer entertainment, and certain online businesses.  Sony Corporation of America and several of its subsidiaries are registered with the Secretary of the Commonwealth of Massachusetts, and have registered agents to accept service of process in Massachusetts.

5.      Defendant Sony Pictures Entertainment Inc. is a subsidiary of Sony Corporation of America, with a principal place of business in Culver City, California.  It is engaged in the business of producing and distributing motion pictures and television programming, developing and marketing entertainment products, and operating studio facilities.  Its products are advertised, marketed, and sold throughout Massachusetts.

**FILED UNDER SEAL**

6.     Defendant Columbia Pictures Industries, Inc. is a subsidiary of Sony Pictures Entertainment Inc., with a principle place of business in Culver City, California.  It is engaged in the business of producing motion pictures.  It is registered with the Secretary of the Commonwealth of Massachusetts, has a registered agent to accept service of process in Massachusetts, and has products that are advertised, marketed, and sold throughout Massachusetts.

7.     Sony Corporation of America, Sony Pictures Entertainment Inc., and Columbia Pictures Industries, Inc. collectively are referred to herein as "defendants."

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1338, as this action arises under the United States copyright laws.

9.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400(a).  In particular, upon information and belief, a substantial part of the property that is the subject of this action is situated in the Commonwealth of Massachusetts, and thus venue is proper under section 1391(b).  Additionally, defendants have registered agents in Massachusetts, and thus venue is proper under section 1400(a).

## BACKGROUND FACTS

10.     In 1948, Julia Child moved to Paris with her husband Paul.  During the years 1948-54, she became interested in French cooking, studied at Le Cordon Bleu, and co-authored the cookbook *Mastering the Art of French Cooking* that has become a fixture in kitchens across America.  Thereafter, from the studios of WGBH in Boston, she taught America how to prepare French cuisine in her syndicated television show "The French Chef" that made her a household name throughout the world.

**FILED UNDER SEAL**

I.   **The Julia Child Memoir**

11.   In 2003-04, at the age of 91, Julia Child, in collaboration with her grandnephew Alex Prud'homme, wrote a memoir entitled *My Life in France*, which recounts in great detail Julia Child's selected memories and impressions of her time in France during the period 1948-54 (hereinafter, the "Julia Child Memoir").  The Julia Child Memoir describes both significant and incidental events and occurrences, replete with Julia Child's impressions, opinions, perceptions, reactions, feelings and beliefs, all of which serve to illuminate Julia Child's personal vision at the age of 91 of her life during that early time in France, and to infuse the telling of her story in France with dramatic significance.  One can virtually hear Julia Child's voice enthusiastically booming off the pages.

12.   The Julia Child Memoir was published by Alfred Knopf Publishers in April 2006, appeared on the New York Times Best Seller List shortly after its publication, has sold approximately 200,000 copies in hard-cover, and is due to be released in paperback in October 2007.

13.   The Child Foundation and Prud'homme filed a claim to copyright in the Julia Child Memoir and, on April 19, 2006, the Register of Copyrights, United States Copyright Office, Library of Congress, Washington, D.C. registered the claim to copyright and issued Certificate of Registration No. TX-6-349-460 with respect to the literary work.  A true and correct copy of Certificate of Registration TX-6-349-460 is submitted herewith as Exhibit 1.[1]  A copy of the Julia Child Memoir is submitted herewith as Exhibit 2.

II.   **The Julie Powell Story**

14.   In or about 2005, prior to the publication of the Julia Child Memoir, a secretary in Queens, Long Island, by the name of Julie Powell wrote a book entitled *Julie & Julia*

---

[1] All exhibits to the Complaint have been filed under seal.

**FILED UNDER SEAL**

(hereinafter, the "Julie Powell Story").  A copy of the Julie Powell Story is submitted herewith as Exhibit 3.

15.     The Julie Powell Story is the author's personal story as a working housewife in her thirties living in Queens, New York.  To escape the rut of a dead-end secretarial job, she invents a dramatic self-rescue mission to make sense of her life by determining to cook, in the period of one year, every one of the 524 recipes contained in Julia Child's *Mastering the Art of French Cooking,* "tracking down every obscure ingredient, learning every arcane cooking technique."

16.     Julie Powell does not seek to emulate Julia Child, nor does she even aspire to become a chef.  Rather, her pursuit of cooking, as told in the Julie Powell Story, is simply the vehicle by which the author achieves personal growth and the growth of her marriage.

17.     Accordingly, the Julie Powell Story makes no more than passing incidental reference to Julia Child's life in France (admittedly fictionalized by the author for dramatic purposes), and makes no use of material from the Julia Child Memoir.

III.     **Defendants' Infringing Screenplay and Future Motion Picture**

18.     Upon information and belief, in or about 2006, defendants acquired from Julie Powell an option to produce a motion picture adaptation of the Julie Powell Story.  To this end, upon information and belief, on or about December 14, 2006, defendants and their screenwriters completed a motion picture screenplay that purports to be an adaptation of the Julie Powell Story, which is entitled *Julie & Julia* (the same title as the Julie Powell Story) and consists of 126 pages (hereinafter, the "Powell Screenplay").  A copy of the Powell Screenplay is submitted herewith as Exhibit 4.

**FILED UNDER SEAL**

19.     However, instead of being based solely upon the book optioned by defendants –
the Julie Powell Story – the Powell Screenplay attempts to draw a series of parallels between
Julie Powell's personal growth through learning how to cook, and the personal growth of *Julia
Child* during her years in France from a young woman without direction to an accomplished chef
and co-author of what became a legendary cookbook.

20.     In striking contrast to the Julie Powell Story which makes virtually no reference
to the actual experiences of Julia Child in France during 1948–54, the narrow period covered by
the Julia Child Memoir, more than half of the Powell Screenplay focuses on Julia Child's life in
France during that time.

21.     Accordingly, while the Julia Powell Story makes no use of the material contained
in the Julia Child Memoir, more than half of the Powell Screenplay tracks, slavishly, page-by-
page, the content and expression of the Julia Child Memoir, as to which defendants have neither
sought nor acquired rights.

22.     The Powell Screenplay misappropriates the Julia Child Memoir through
parallelism of incident and similarities of treatment, details, scenes, events, characterization and
dialogue, including close paraphrasing and verbatim copying, collectively constituting the
selected memories of Julia Child concerning her time in France, including the incidental details
selected by Julia Child that serve to dramatize the events of those years as perceived and recalled
by her at the age of 91, and told with Julia Child's own voice and personality.

23.     Upon information and belief, Columbia Pictures Industries, Inc. is the owner and
copyright proprietor of the Powell Screenplay.

24.     Upon information and belief, defendants intend and have taken concrete stops to
commence the making of a feature-length entertainment film based on the Powell Screenplay,

**FILED UNDER SEAL**

including but not limited to making copies of the Powell Screenplay, distributing copies of the

Powell Screenplay to others, and making revisions to the Powell Screenplay in the course of

developing a working "shooting script."

25.     Upon information and belief, production of the motion picture adaptation of the

Powell Screenplay, containing the offending material from the Julia Child Memoir, is scheduled

to commence in the near future.

## IV.   Copyright Infringement

26.     Upon information and belief, defendants and/or their screenwriters had access to

the Julia Child Memoir during the writing of the Powell Screenplay.

27.     The Julia Child Memoir was published in April 2006.

28.     The Powell Screenplay was completed on December 14, 2006, approximately

eight months following publication of the Julia Child Memoir.

29.     The Julia Child Memoir was widely disseminated and appeared on the New York

Times Bestseller List for 8 weeks following its publication in April 2006.  It has sold

approximately 200,000 copies in hard-cover, and is scheduled to be released in paperback in

October 2007.

30.     Only 6 of the 306 pages of the Julie Powell Story, or less than two (2%) percent

of the book's content, make reference to Julia Child's life in France, and even those few

instances are acknowledged by the author as having been fictionalized from her imagination.

31.     By contrast, 66 of the 126 pages of the Powell Screenplay, or more than fifty

(50%) percent of the content, focus on Julia Child's life in France during the same time period

covered by the Julia Child Memoir.

**FILED UNDER SEAL**

32.    To enhance the drama of the film and plausibly make a more successful movie, the Powell Screenplay copies slavishly from the Julia Child Memoir.

33.    The Powell Screenplay presents the same arrangement of events that Julia Child selected for and incorporated in the Julia Child Memoir, including the incidental details selected by Julia Child to dramatize those events.

34.    The Powell Screenplay's copying of material from the Julia Child Memoir extends to Julia Child's manner of expression, her analysis and interpretation of her experiences in France, her opinions and feelings, the manner in which she structured her material and marshaled the dramatic content of her story, her choice of words, and the emphasis she gave to particular events in her life.

35.    The Powell Screenplay contains instances of close paraphrasing and verbatim copying of the words that Julia Child used to tell her story in the Julia Child Memoir.

36.    Defendants' copying goes far beyond the taking of a general theme, premise, or abstract idea, but descends deeply into the protected expression of the Julia Child Memoir consisting of Julia Child's unique selection, sequence, arrangement and treatment of the events and scenes of her life.

37.    The striking parallelism of incident, together with the parallelism of selected detail to describe those incidents, including the close paraphrasing and verbatim appropriation of Julia Child's own words to add the flavor of Julia Child to a dramatic motion picture, unless prohibited by copyright laws, will effectively deprive autobiographers and memoirists of the full enjoyment of their copyright – *e.g.*, the right to make a derivative motion picture adaptation of their recorded personal memories.

**FILED UNDER SEAL**

38.    Some examples of defendants' copying of the Julia Child Memoir are as follows:

| **Powell Screenplay** | **Julia Child Memoir** |
| --- | --- |
| **P. 1:** The Powell Screenplay dramatically opens at the port in Le Havre where Julia and Paul Child's "sky-blue 1947 Buick station wagon dangles in the air on a crane [and] starts its descent" having just been off-loaded from the hull of a ship, and refers to "[a] diplomatic license plate affixed to the car." | **P. 14:** The Julia Child Memoir dramatically opens at the port in Le Havre where Julia and Paul Child's Buick is held by a crane having just been off-loaded from the hull of a ship: "Finally our crane pulled our large sky-blue Buick station wagon . . . out of the ship's hold. The Buick swung overhead in a sling and then dropped down to the dock." The Julia Child Memoir refers to "our diplomatic license plates" affixed to the car. |
| **P. 1:** Julia and Paul have their first meal in France at La Couronne, a restaurant in Rouen, dining on "Dover sole, *sputtering* in butter." (Emphasis added) | **P. 16, 18:** Julia and Paul have their first meal in France at La Couronne, a restaurant in Rouen, dining on "Dover sole that was perfectly browned in a *sputtering* butter sauce." (Emphasis added) |
| **P. 4:** To establish the dramatic effect of Julia's first experience in her kitchen in their new (but old) Paris apartment, the Powell Screenplay describes: "Light pours through the window. She towers over the stove and sink." | **P. 74:** To establish the dramatic effect of Julia's first experience in her kitchen in their new (but old) Paris apartment, the Julia Child Memoir contains a photo taken by Paul of Julia bathed in light from the kitchen window as she towers above the sink. |
| **P 5:** Describes how happy Julia is to be in France. | **PP. 25, 35, 38:** Describes how happy Julia is to be in France. |
| **P. 14:** Julia befriends the merchants at the neighborhood market as Paul takes photographs: "Julia, carrying groceries, walks down a crowded Paris market street . . . . Everyone loves her . . . . Paul takes photographs of Paris as Julia chats up a grumpy chestnut vendor, who is charmed by her." | **PP. 40-42:** Julia befriends the merchants at the neighborhood market as Paul takes photographs: "I shopped at our neighborhood marketplace . . . . and I got to know all the regulars . . . . Paul, the mad photographer, always carried his trusty camera slung over his shoulder and had a small sketchpad stuffed in his pocket." |
| **P. 15:** JULIA: "I feel that I am French.  I just must be." | **P. 54:** "I had come to the conclusion that I must really *be* French." (Emphasis in original) |
| **P. 18:**  Describes that, for her 37th birthday, | **P. 56:**  Describes that, for her 37th birthday, |

**FILED UNDER SEAL**

| | |
|---|---|
| Paul gives Julia "a copy of *Larousse Gastronomique*, the 1100-page bible of French cooking." | Paul gives Julia "the *Larousse Gastronomique*, a wonder-book of 1,087 pages of sheer cookery." |
| **PP. 28-30:** Describes Julia's enrollment at the Cordon Bleu cooking school, that Julia wears her pearls to class and that, after first being assigned to a small class of two women ("two young American housewives"). | **PP. 57, 59:** Describes Julia's enrollment at the Cordon Bleu cooking school, that Julia wears her pearls to class and was first assigned to a small class of two women ("an English and a French girl of about my age"). |
| | **P. 58:** Photo shows Julia wearing her pearls to cooking class with Chef Bugnard. |
| Julia found this class unchallenging, but was told that she was not an advanced cook: "JULIA: I was hoping for something more advanced, Madame Brassart – MADAME BRASSART: But you are not an advanced cook." | Julia found this class unchallenging, but was told that she was not an advanced cook: "I sat down with Madame Elizabeth Brassart . . . and explained that I'd had a more rigorous program in mind . . . . Madame Brassart decreed that I was not advanced enough for haute cuisine." |
| Julia is reassigned to a more advanced class of professionals -- eleven World War II vets who regard her with disdain: "Eleven men, all American World War II vets . . . . On the men. One rolls his eyes. Another smirks." | Julia is reassigned to a more advanced class of professionals -- eleven World War II vets who regard her with disdain: "[T]he restauranteers' class was made up of eleven former GIs . . . but when I walked into the classroom the GIs made me feel as if I had invaded their boys' club." |
| **P. 31:** JULIA: "Every morning the alarm goes off at 6:30 and I leap out of bed." | **P. 61:** "Every morning, I'd pop awake at 6:30 . . ." |
| **P. 32:** JULIA: "By 7:30 I'm in class, in my apron, peeling potatoes." | **P. 61:** "At 7:20 I'd walk two blocks to school and don my 'uniform,' an ill-fitting white housedress and a blue chef's apron with a clean dish towel tucked into the waist cord. Then I'd select a razor-sharp paring knife and start to peel onions while chitchatting with the GIs." |
| **P. 32:** "JULIA (V.O., CONTINUED) The morning class ends at 12:30 and I go home and make lunch for Paul (continued)<br><br>INT. JULIA CHILD'S KITCHEN – 1949 – | **P. 35:** "But [Paul] wasn't professionally ambitious. [For lunch] Paul often had a sandwich alone with his camera on the banks of the Seine. Or he'd come home for leftovers with me . . . followed by a brief |

FILED UNDER SEAL

| | |
|---|---|
| DAY Julia and Paul eat lunch.<br><br>JULIA (V.O., CONTINUED) Then Paul takes a nap." | nap."<br><br>**P. 61:** "At 12:30 Paul would come home for lunch, and we'd eat and catch up. He'd sometimes take a quick catnap . . . ." |
| **P. 33:** JULIA: "Afterwards I go back to school and Paul goes back to the embassy." | **P. 62:** "… but more often [Paul] would rush back across the Seine to put out the latest brushfire at the embassy." |
| **P. 33:** CHEF MAX BUGNARD: "If you make a mistake, do not apologize. Joy! Fun! This is what matters!" | **P. 61:** "Bugnard insisted that one pay attention, learn the correct technique, and that one enjoy one's cooking – 'Yes, Madame Scheeld, *fun!*' he'd say. 'Joy!'" (Emphasis in original) |
| **P. 34:** JULIA: "Avis, I'm in heaven here. I've been looking for a career all my life and I've found it." | **P. 63:** "How magnificent to find my life's calling, at long last!" |
| **P. 34:** Julia and Paul wear red paper hearts on their white T-shirts to a Valentine's Day party: "Julia wears a large red paper heart pinned onto her white blouse . . . . Paul wears a red paper heart like Julia's. On the wall is a large photograph of Julia and Paul wearing their matching white shirts pinned with red paper hearts and holding a sign that reads: 'Happy Valentine's Day from Paris, 1950." | **Front Cover of Book:** Shows Julia and Paul with red paper hearts pinned on their white shirts.<br><br>**P. 200:** Paul incorporated this photograph into his 1959 Valentine card design. |
| **P. 35:** JULIA: "The woman who runs [Cordon Bleu] absolutely hates me." | **PP. 57-58:** "[Mme. Brassart] made it quite clear that she didn't like me …" |
| **P. 36:** PAUL CHILD: "Julia in front of her stove has the same fascination for me as watching a kettle drummer at the symphony. The oven door opens and shuts so fast you hardly notice the deft thrust of a spoon as she dips into a casserole and up to her mouth for a taste-check like a perfectly-timed double-beat on the drums." | **P. 72:** "The sight of Julie in front of her stove . . . has the same fascination for me as watching a kettle-drummer at the Symphony . . . . The oven door opens and shuts so fast you hardly notice the deft thrust of a spoon as she dips into a casserole and up to her mouth for a taste-check like a perfectly timed double-beat on the drums." |
| **P. 47:** Julia is unable to schedule her final exam at Cordon Bleu because of difficulties with Mme. Brassart, the head of the school. | **P. 101:** Julia is unable to schedule her final exam at Cordon Bleu because of difficulties with Mme. Brassart, the head of the school. |

FILED UNDER SEAL

| | |
|---|---|
| **P. 47:** JULIA : "I left a message about taking the test for my diploma but I haven't heard from you - -<br><br>MADAM BRASSART: At some point you will hear from me."<br><br>Madame Brassart walks into her office and closes the door. | **P. 100:** "By late 1950, I felt ready to take my final examination, and earn my *diplome* from the Cordon Bleu. But when I asked Madame Brassart to schedule the test – politely at first but then with increasing insistence - - my requests were met with stony silence." |
| **P. 47:** Julia meets Simone ("Simca") Beck and Louisette Bertholle: "WOMAN AT PARTY: I can't believe you two haven't met, you're all such wonderful cooks. Simca and Louisette are writing a cookbook -- LOUISETTE:  For Americans." | **P. 115:** Julia meets Simone ("Simca") Beck and Louisette Bertholle:  "A few days later [after Julia had invited Simca to lunch at her home], Simca introduced me to another Gourmette, Madame Louisette Bertholle . . . . Simca and Louisette, it turned out, had been working on a cookbook that they hoped to publish in the United States." |
| **PP. 46-47:**  Julia asks Mme. Brassart to schedule her final examination at Cordon Bleu, but is unsuccessful: "JULIA:  I left a message about taking the test for my diploma but I haven't heard from you – MADAME BRASSART:  At some point you will hear from me . . . . JULIA: (talking to several women) I can't get the damn woman to schedule my test." | **P. 100:**  Julia asks Mme. Brassart to schedule her final examination at Cordon Bleu, but is unsuccessful: "By late 1950, I felt ready to take my final examination, and earn my *diplome* from the Cordon Bleu. But when I asked Madame Brassart to schedule the test – politely, at first, and then with an increasing insistence – my requests were met with stony silence." |
| **P. 48:**  To persuade Mme. Brassart to schedule her test, Julia writes her a letter stating that everyone at the American Embassy knows she is at the school and will be surprised if she is not permitted to take her final exam:<br><br>JULIA: "Dear Madame Brassart: Everyone at the American Embassy, including the Ambassador, knows that I have been studying at the Cordon Bleu morning noon and night and they will all be very surprised if I am not allowed to take my examination." | **P. 101:**  To persuade Mme. Brassart to schedule her test, Julia writes her a letter stating that everyone at the American Embassy knows she is at the school and will be surprised if she is not permitted to take her final exam:<br><br>"After waiting and waiting I sent Madame Brassart a stern letter in March 1951, noting that 'all my American friends and even the U.S. ambassador himself' knew I had been slaving away at the Cordon Bleu, 'morning, noon and night.'" |
| **P. 49:**  The test that Julia is finally given inquires about the ingredients for three | **PP. 101, 103:**  The test that Julia is finally given inquires about the ingredients for |

| | |
|---|---|
| obscure recipes that she had no reason to believe would be on the test, and she is distraught to think that she may have failed the examination. | three obscure recipes that she had no reason to believe would be on the test, and she is distraught to think that she may have failed the examination. |
| The test question that Julia Child could not answer is described: "MADAME BRASSART: You will write the recipes for oeufs Mollets, Cotellettes de Veau en Surprise, and Crème Renversee au Caramel. . ." | The test question that Julia Child could not answer is described: "On the Big Day, I arrived at the school and they handed me a little typewritten card that said: 'Write out the ingredients for the following dishes, to serve three people: *oeufs mollets avec sauce béarnaise; cotelettes de veau en surprise; crème renversee au caramel.*'" |
| Julia is distraught about the exam and whether she failed it: "JULIA: I had no idea what a veal en surprise was. None. We cooked it in class, it's a veal chop with mushrooms in a paper bag. That's the surprise – you open the bag. Surprise! Veal with mushrooms! I have never flunked a test in my life...." | Julia is distraught about the exam and whether she failed it: "Did I remember what an *oeuf mollet* was? No. How could I miss that? . . . . How about the *veau 'en surprise'*? No. (A sautéed veal chop with *duxelles* – hashed mushrooms – on either side, overlayed with ham slices, and all wrapped up in a bag – the 'surprise' – that is then browned in the oven.) .... I despaired that the school would ever deign to grant me a certificate." |
| **P. 49:** Julia, Simca and Louisette discuss starting a cooking school: "SIMCA: Meanwhile, you can come teach with us. JULIA: Me? LOUISETTE: Why not?" | **P. 117:** Julia, Simca and Louisette discuss starting a cooking school: "All this cookery talk made me eager to put the finishing touches on my own recipes and to start teaching. My ideal pupils would be just the kind of person I had been: those who aspired to be accomplished home cooks, capable of making the basic themes and variations of *la cuisine* bourgeoise, but didn't know where to begin. Simca, Louisette and I discussed this idea, and discussed it some more, and before long we had agreed to start up a little cooking school of our own, right there in Paris." |
| **P. 50:** Julia is retested at Cordon Bleu: "CORDON BLEU COOKING SCHOOL – 1951 – DAY: Madame Brassart grimly hands Julia another test." | **P. 110:** Julia is retested at Cordon Bleu: "Once again, Chef Bugnard spoke to [Madame Brassart] on my behalf, and once again a date for my test was miraculously set." |

FILED UNDER SEAL

| | |
|---|---|
| **P. 57:** Julia receives her diploma from Cordon Bleu: "JULIA CHILD'S KITCHEN – 1952 – DAY: Julia types the menu for the first class at L'Ecole des Trois Gourmandes. On the wall is Julia's diploma from the Cordon Bleu." | **P. 110:** Julia receives her diploma from Cordon Bleu: " In September, after we had returned from the States, I finally received my diploma. It was signed by Madame Brassart and Chef Max Bugnard, and had been backdated to March 15, 1951! At last, Julia McWilliams Child could say that she was a full-fledged graduate of Le Cordon Bleu, of Paris, France." |
| **P. 59:** JULIA: "Remember, if it isn't perfect, no excuses, no explanations." | **P. 71:** "I made sure not to apologize for [the error in preparation]. This was a rule of mine. I don't believe in twisting yourself into knots of excuses and explanations over the food you make." |
| **P. 59:** JULIA: "Make friends with your butcher." | **P. 70:** "Indeed, shopping for food in Paris was a life-changing experience for me. It was through daily excursions to my local marketplace on la Rue de Bourgogne, or to the bigger one on la Rue Cler, or best of all, into the organized chaos of Les Halles - - that I learned one of the most important lessons of my life: the value of *les human relations*." |
| **PP. 60-64:** Julia's sister Dorothy arrives in Paris, has lunch with Julia and Paul, meets Ivan Cousins at a party at the American Embassy, takes a liking to him and, soon thereafter, they marry – notwithstanding the disapproval of Julia's father. | **PP. 99, 100, 109, 110 :** Julia's sister Dorothy arrives in Paris, has lunch with Julia and Paul, meets Ivan Cousins at a party at the American Embassy, takes a liking to him and, soon thereafter, they marry – notwithstanding the disapproval of Julia's father. |
| **PP. 64-65:** At dinner with Julia's father John McWilliams, the subject of Senator McCarthy is raised and Julia's father comments: "Senator McCarthy is a man who knows his mind. I admire a man who knows his mind." | **PP. 182-83:** In a letter replying to Julia Child's shock and dismay over the McCarthy purge, John McWilliams comments: "It is a hard dirty job that has to be done and it takes a rough and ready person like McCarthy to do it." |
| **P. 66:** JULIA: "Dorothy's pregnant! Oh, Paul. Isn't it wonderful?<br><br>Julia bursts into tears. | **P. 128:** "Dortie wrote to say she was pregnant, and described herself as 'fat and helpless.' I was so happy for her now that she was a full-fledged *woman* with a breast-full of milk." |

**FILED UNDER SEAL**

| | |
|---|---|
| Paul puts his arms around her.<br><br>She's weeping uncontrollably." | |
| **P. 67:** "SIMCA: Julia, we have a little problem, our editor - -<br><br>LOUISETTE: For our cookbook - -<br><br>SIMCA: - - thinks our book is not in English.<br><br>JULIA: But it is in English.<br><br>SIMCA: They are giving it a rejection. But they suggested that if we were determined to continue with it, we should get a collaborator, who could take what we have and make it work for American cooks . . . . Would you do it, Julia? You don't have to say yes right now, you could think about it.<br><br>JULIA: I would love to." | **P. 132:** "My disheartened friends now faced the daunting job of finishing their work without a real understanding of how to write for the American market. As we talked it over, they almost shyly asked if I might, perhaps, be willing to help them finish their book. 'I would be delighted to!' I answered, almost before the question was out of their mouths. And so our collaboration began." |
| **P. 72:** Describing Simca's and Louisette's failed manuscript for a cookbook: "On the table is the 600-page manuscript for Simca and Louisette's failed cookbook. JULIA: It's just a big dry collection of recipes." | **P. 132:** Describing Simca's and Louisette's failed manuscript for a cookbook: "I first read their nearly six-hundred-page manuscript in September 1952 ... Simca and Louisette had created a big jumble of recipes." |
| **P. 72:** "It doesn't work at all, its horribly written. I'm going to have to throw most of it out and start again. This has got to be a cookbook that makes French cooking accessible to Americans who don't have cooks." | **P. 132:** "Their language wasn't 'American' . . . . And the overall conception of the book was not well suited for the American home kitchen. In fact, I didn't like it at all." |

39.    The examples set forth in paragraph 38 are just some of the many instances of copying that occur throughout the entirety of the 126-page Powell Screenplay. Such bodily appropriation of the entire structure of an author's personal memoir, including pervasive parallelism of incident, detail, the manner in which facts were marshaled and presented, the

FILED UNDER SEAL

author's analysis and interpretation of the events in her life, the emphasis she gave to those events, the manner in which the author expresses herself, her particular words and even her punctuation invades the memoirist's expression of the facts of her life and constitutes an infringement of her copyright.

40.     Defendants' unlawful appropriations comprise the heart of the Julia Child Memoir and the heart of the Powell Screenplay.

41.     By comparing the Powell Screenplay to the Julia Child Memoir, one is left with the indelible impression that the Powell Screenplay was authored with pencil in one hand and the Julia Child Memoir in the other.  Indeed, every one of the major incidents and observations in the Powell Screenplay relating to Julia Child can be traced to the Julia Child Memoir.

42.     Upon information and belief, the motion picture film that defendants intend and have taken concrete steps to make based on the infringing Powell Screenplay will be strikingly and substantially similar to the Julia Child Memoir and, if not prohibited, will preempt plaintiffs' ability to make their own motion picture adaptation of the Julia Child Memoir in the reasonably foreseeable future and will cause plaintiffs to lose an existing offer by a well-regarded film producer to adapt the Julia Child Memoir into a feature length motion picture film.

43.     Defendants are not biographers, historians, or scholars.

44.     Defendants are filmmakers of the commercial genre.

45.     Defendants have not used the Julia Child Memoir for the purpose of criticism, comment, reporting, teaching, scholarship or research, but rather to enhance and otherwise dramatize the Julie Powell Story for a fictionalized dramatic motion picture.

**FILED UNDER SEAL**

46.     Defendants are not primarily concerned with issues of truth, but of drama, as made abundantly clear by their alteration and revision of facts contained in the Julia Child Memoir whenever dictated by dramatic considerations.

47.     The Powell Screenplay is not a work of historical or biographical scholarship the purpose of which is to inform, but rather a dramatic account loosely based on autobiographical material relating to the lives of two individuals who actually had no association with each other – Julie Powell and Julia Child – solely for purposes of entertainment.

48.     Defendants' misappropriation does not constitute a fair use under copyright laws.

## V.     **Effect of the Infringement**

49.     The natural, probable, and foreseeable result of defendants' wrongful conduct has been and will be to deprive plaintiffs of the benefits of selling, licensing and making derivative works of the Julia Child Memoir.

50.     Plaintiffs have received an offer to make a motion picture adaptation of the Julia Child Memoir. However, this motion picture adaptation has been postponed by the film producer because of the discovery of the Powell Screenplay and defendants' intent to make a motion picture based on the Powell Screenplay but which incorporates the heart and essence of the Julia Child Memoir.

51.     Plaintiffs' motion picture adaptation of the Julia Child Memoir will be entirely about Julia Child's life in France. Unlike the Powell Screenplay, it will not include any references to Julie Powell.

52.     Plaintiffs' film project based on the Julia Child Memoir will be effectively lost for the foreseeable future if defendants are permitted to use the heart of the Julia Child Memoir as the basis of a competing film about Julie Powell, and the public will be deprived for the

foreseeable future of a motion picture that tells Julia Child's own version of her life in France during her formative years.

53.     Plaintiffs also will lose sales of the Julia Child Memoir and other opportunities to license and make derivative works based on the Julia Child Memoir unless defendants are enjoined from infringement.

54.     As a direct and proximate result of the infringing acts by defendants alleged above, plaintiffs have suffered irreparable injury and have sustained lost profits.

55.     Plaintiffs have no adequate remedy at law to redress the injuries that defendants have caused by their conduct.

56.     Plaintiffs will continue to suffer irreparable damage and sustain lost profits unless and until defendants are enjoined from infringing plaintiffs' copyright in the Julia Child Memoir.

## COUNT I - COPYRIGHT INFRINGEMENT
## (EXCLUSIVE RIGHT TO REPRODUCE AND DISTRIBUTE)
### (17 U.S.C. §§ 101 et seq.)

57.     Plaintiffs incorporate by reference as though fully set forth herein each and every allegation contained in Paragraphs 1 through 56, inclusive, above.

58.     Plaintiffs own a registered and valid copyright to the Julia Child Memoir, which is a literary work.

59.     Among other things, plaintiffs have the exclusive rights under 17 U.S.C. § 106 to reproduce and distribute the Julia Child Memoir.

60.     The Powell Screenplay is strikingly and substantially similar to the Julia Child Memoir, and thus copies the Julia Child Memoir.

61.     Defendants have authored, copied and distributed the Powell Screenplay, which constitutes a violation of plaintiffs' exclusive rights to reproduce and distribute the Julia Child

FILED UNDER SEAL

Memoir under 17 U.S.C. § 106, and therefore constitutes an infringement of plaintiffs' copyright in the Julia Child Memoir.

62.    Upon information and belief, the motion picture that defendants intend and have taken concrete steps to make based on the infringing Powell Screenplay will violate plaintiffs' exclusive rights to reproduce and distribute the Julia Child Memoir under 17 U.S.C. § 106, and therefore will constitute an infringement of plaintiffs' copyright in the Julia Child Memoir.

63.    Upon information and belief, defendants willfully and knowingly violated plaintiffs' copyright to the Julia Child Memoir.

64.    As a direct and proximate result of defendants' violation of plaintiffs' copyright to the Julia Child Memoir, plaintiffs have suffered and will continue to suffer damages.

65.    Plaintiffs are entitled to an injunction restraining defendants, their officers, agents and employees, and all persons acting in concert or participation with them, from engaging in any further such acts in violation of plaintiffs' copyright.

66.    Plaintiffs are further entitled to recover from defendants the damages, including attorneys' fees, they have sustained from, among other things, lost opportunities, and any gains, profits and advantages obtained by defendants as a result of their acts of infringement alleged above.  Alternatively, plaintiffs are entitled to recover, at their sole election, statutory damages as provided by 17 U.S.C. § 504(c).

**FILED UNDER SEAL**

## COUNT II - COPYRIGHT INFRINGEMENT
## (EXCLUSIVE RIGHT TO MAKE DERIVATIVE WORKS)
### (17 U.S.C. §§ 101 et seq.)

67.     Plaintiffs incorporate by reference as though fully set forth herein each and every allegation contained in Paragraphs 1 through 66, inclusive, above.

68.     Plaintiffs own a registered and valid copyright to the Julia Child Memoir, which is a literary work.

69.     Among other things, plaintiffs have the exclusive right under 17 U.S.C. § 106 to make derivative works based on the Julia Child Memoir.

70.     The Powell Screenplay is strikingly and substantially similar to the Julia Child Memoir, and thus copies the Julia Child Memoir.

71.     Defendants have authored, copied and distributed the Powell Screenplay, which constitutes a violation of plaintiffs' exclusive right to make derivative works of the Julia Child Memoir under 17 U.S.C. § 106, and therefore constitutes an infringement of plaintiffs' copyright in the Julia Child Memoir.

72.     Upon information and belief, the motion picture that defendants intend and have taken concrete steps to make based on the infringing Powell Screenplay will violate plaintiffs' exclusive rights under 17 U.S.C. § 106, and therefore will constitute an infringement of plaintiffs' copyright in the Julia Child Memoir.

73.     Upon information and belief, defendants willfully and knowingly violated plaintiffs' copyright to the Julia Child Memoir.

74.     As a direct and proximate result of defendants' violation of plaintiffs' copyright to the Julia Child Memoir, plaintiffs have suffered and will continue to suffer damages.

FILED UNDER SEAL

75.     Plaintiffs are entitled to an injunction restraining defendants, their officers, agents and employees, and all persons acting in concert or participation with them, from engaging in any further such acts in violation of plaintiffs' copyright.

76.     Plaintiffs are further entitled to recover from defendants the damages, including attorneys' fees, they have sustained from, among other things, lost opportunities, and any gains, profits and advantages obtained by defendants as a result of their acts of infringement alleged above.  Alternatively, plaintiffs are entitled to recover, at their sole election, statutory damages as provided by 17 U.S.C. § 504(c).

WHEREFORE, plaintiffs pray for judgment as follows:

A.     Enter judgment for plaintiffs on each count in the Complaint;

B.     Adjudge that plaintiffs are the owners of a valid and enforceable copyright in the Julia Child Memoir;

C.     Adjudge that defendants have infringed and will continue to infringe plaintiffs' copyright in the Julia Child Memoir, and that such infringement has been willful and deliberate;

D.     Preliminarily and permanently enjoin defendants, their respective directors, officers, agents, servants and employees, and all other persons in active concert, privity or participation with them, from directly or indirectly infringing plaintiffs' copyright in the Julia Child Memoir;

E.     Order the defendants and their respective directors, officers, agents, servants and employees, and all other persons in active concert, privity or participation with them, to turn over to plaintiffs for destruction the Powell Screenplay, together

FILED UNDER SEAL

with all drafts and copies of the Powell Screenplay, within their possession, custody or control;

F.      Award plaintiffs actual damages according to proof and defendants' profits attributable to the acts alleged herein according to proof, or in the alternative, and at plaintiffs' sole election, award statutory damages pursuant to 17 U.S.C. § 504(c);

G.      Award pre-judgment and post-judgment interest accrued on any damages as provided by law;

H.      Award plaintiffs costs and attorneys' fees as provided by 17 U.S.C. § 505 and by other provisions of law; and

I.      Grant such other and further relief as the Court deems proper under the circumstance.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

THE JULIA CHILD FOUNDATION FOR
GASTRONOMY AND THE CULINARY ARTS
and ALEX PRUD'HOMME

By their attorneys,

_____
Peter A. Herbert
William R. Grimm (BBO # 212120)
Deborah L. Benson (BBO # 037990)
Eric D. Levin (BBO # 639717)
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109
(617) 345-9000

Dated: September 19, 2007